UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

RHONDA LIEBERMAN,                                    **Docket No.:**

                          *Plaintiff,*               **COMPLAINT**

        -against-                                     **PLAINTIFF DEMANDS
                                                     A JURY TRIAL**

ELIZABETH SETON PEDIATRIC CENTER and
SISTERS OF CHARITY FEDERATION, INC.,

                          *Defendants.*
-------------------------------------------------------------------------X

        Plaintiff, as and for her Complaint, respectfully alleges, all upon information and belief,

as follows:


                            **JURISDICTION AND VENUE**

        1.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 and 31 U.S.C. § 3732(a), since the claims contained in the complaint arise from violations

of laws of the United States of America.


        2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims contained in this

action, which are within the original jurisdiction of the Court, that they form part of the same case

or controversy under Article III of the United States Constitution, and jurisdiction over Plaintiff's

New York False Claims Act claim is also invoked pursuant to 31 U.S.C. § 3732.


        3.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a) because Elizabeth Seton Pediatric Center and Sisters of Charity Federation, Inc.,

respectively, are found, reside, or transact business in the Southern District of New York, and 31 U.S.C. § 3732(a) further provides for nationwide service of process.

4.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732 because Defendants conduct business and some, or all, of the actions or omissions that give rise to Plaintiff's claims occurred within this judicial district.

## IDENTITY OF THE PARTIES

5.      Defendant Elizabeth Seton Pediatric Center is a domestic not-for-profit corporation organized under the laws of the State of New York, with its principal place of business and headquarters located at 300 Corporate Boulevard, Yonkers, New York 10701.

6.      Defendant Sisters of Charity Federation, Inc. ("Sisters of Charity") is a domestic not-for-profit corporation organized under the laws of the State of New York, with its principal place of business and headquarters located at 6301 Riverdale Avenue, Bronx, New York 10471.

7.      Defendant Elizabeth Seton Pediatric Center is a wholly owned subsidiary, partner or affiliate of Defendant Sisters of Charity and Defendants are collectively referred to herein as ("ESPC").

8.      Plaintiff Rhonda Lieberman ("Lieberman") was employed by ESPC from October 2016 until her unlawful termination on September 26, 2017, because of her complaints about unlawful Medicaid patient admissions practices and billing practices.

2

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

9.     ESPC is a domestic not-for-profit corporation that provides pediatric, rehabilitative and palliative care to children, including long-term nursing care for medically complex pediatric residents ranging in age from infancy to 21 years old.

10.    At all relevant times the care provided by ESPC was funded (at least in part) by the federal government, as well as the City and State of New York, through Medicaid payments received by ESPC.

11.    As a result, prior to admission for any patient and any length of stay, ESPC is required by federal and New York State law to comply with the Patient Review Instrument ("PRI") and Preadmission Screening and Resident Review screen ("Screen") requirements that are imposed on institutional recipients of Medicaid funds in New York (collectively, the "PRI and Screen").

12.    The substance and intent of the PRI and Screen is to ensure that prospective patients are not inappropriately placed in nursing homes for long term care before all less intrusive community and home-based service options are exhausted.

13.    The PRI and Screen not only prevents overspending in the Medicaid system, as long-term care in nursing home facilities generally costs much more than care typically provided in less restrictive environments in the community, but also protects the most vulnerable members of the public by placing them in least restrictive environments necessary to provide the required

3

care.

14.     The PRI and Screen ensures that all applicants to a Medicaid-certified nursing facility: 1) be first evaluated for serious mental illness ("SMI") and/or intellectual disability ("ID"); 2) be offered the most appropriate setting for their needs (i.e., in the community, a nursing facility, or acute care settings); and 3) receive the services they need in those settings.

15.     The PRI and Screen further requires that all applicants to Medicaid-certified Nursing Facilities first be screened by a licensed professional, typically a nurse, using the most current Patient Review Instrument ("PRI") and then, using the information obtained through the PRI and elsewhere, undergo a PASRR screen, which is a separate preliminary assessment to determine whether the patient *might* have Serious Mental Illness ("SMI") or Intellectual Disability or Related Conditions ("ID"), which is called a Level I screen, and those individuals who test positive at Level I are then evaluated in depth, called a Level II screen.

16.     In addition to collecting data used for Medicaid reimbursement, the PRI and Screen results in a determination of need, determination of appropriate setting and a set of recommendations for services that inform the plan of care for the patient.

17.     ESPC successfully recruited Lieberman after approximately 17 ongoing years working with The Children's Hospital at Montefiore, most recently as the Assistant Director of Social Work, and on or about October 17, 2016, Lieberman joined ESPC as VP of Child and Family Services.

4

18.    In her role as VP of Child and Family Services, Lieberman oversaw all social work, child life, recreation therapy, creative arts therapy and transportation at ESPC.

19.    Lieberman's direct supervisor was Lisa Poskanzer ("Poskanzer"), VP of Operations at ESPC, who in turn reported to Pat Tursi ("Tursi"), Chief Executive Officer of ESPC, and Lieberman's assigned "Mentor" was Carmela Senese ("Senese"), Chief of Rehabilitation at ESPC.

20.    At all relevant times, Lieberman was fully qualified for her position, as confirmed by, among other things, her years of relevant experience, the very favorable performance evaluation she received after her six-month probation period ended in late April 2017 and the positive comments she received about her efficiency, thoroughness, decision making abilities and policy suggestions throughout her tenure at ESPC.

21.    During her eleven months of employment at ESPC, Lieberman notched several significant business accomplishments for ESPC, including: (a) helping to increase volume of admissions and discharges, as Tursi had asked Lieberman to do during her job interview; (b) streamlining the ESPC Admissions Department and restructuring the Social Work Department; and (c) developing systems, policies, and procedures for Family-Centered Care, Behavioral Health, Discharge Planning and Psychosocial Rounds.

22.    Additionally, Lieberman received numerous compliments from her colleagues at ESPC about how much she was appreciated because of her level of expertise, clinical social work competency and unique perspective.

23.     Specifically, Senese, Lieberman's Mentor and ESPC's Chief of Rehabilitation, told Lieberman that she thought Lieberman ran meetings well, encouraged collaboration, was good at conflict resolution and was a great asset to ESPC, and Lieberman's direct supervisor, Poskanzer, often praised Lieberman for her efforts and innovations and said on several occasions that Lieberman's level of expertise and training was of a caliber that ESPC was unaccustomed to having in its staff.

24.     Indeed, because of her demonstrated abilities, soon after arriving at ESPC, Lieberman was tasked with the important project of revamping the admissions process, under the supervision of Poskanzer, to accommodate the demands of an expansion in bed capacity that was already underway.

25.     In the course of understanding the current admissions process at ESPC, in or about January 2017 Lieberman learned that ESPC was not in compliance with the PRI and Screen requirements.

26.     Specifically, Lieberman learned that ESPC was in material breach of two aspects of the PASRR requirements: 1) the prerequisite "Level I" and "Level II" screens required by the PASRR for new ESPC pediatric patients were not being completed prior to admission, but instead after patient admission had occurred – sometimes by several days – circumventing the intent of the PASRR program entirely; and 2) using an outdated and improper document to satisfy the PRI requirement and demonstrate eligibility to obtain Medicaid funds.

27.     In or around January 2017, Lieberman first reported to Poskanzer that ESPC regularly admitted new patients without requiring and obtaining a PRI and Screen.

28.     Poskanzer ignored Lieberman's concern because, according to Poskanzer, the PRI and Screen were still done later by ESPC and the New York State Department of Health "only cares that the PASSR screen is completed not when or by whom," which Lieberman knew was not correct.

29.     Lieberman immediately responded to Poskanzer that the pertinent regulations clearly prohibited ESPC's practices in this regard, but Poskanzer dismissively replied that it had never been a problem so Lieberman "shouldn't worry about it."

30.     In or about May of 2017, after further researching the underlying laws and confirming her concerns, Lieberman convened a meeting with Carolyn Ryan, VP of Quality; Deborah Moore, Director of Medical Records; Margie Rodriguez, Director of Admissions (who reported to Lieberman); Selena Perez, Head of Social Work (who reported to Lieberman); and Mary Phelan, the ESPC Social Worker who Lieberman learned was told by ESPC to do the screens after the pediatric patient had been admitted.

31.     At this meeting, Lieberman again shared her concerns and research and asked that ESPC revise its unlawful practice immediately.

7

32.     However, Lieberman received strong resistance from Margie Rodriguez, Director of Admissions at ESPC ("Rodriguez"), who was responsible for obtaining the PRI and Screen prior to admission at ESPC, and who stated to Lieberman in sum and substance that it would be impossible to get a PRI and Screen for all admissions without substantially delaying the admissions process at ESPC at a critical time when "we're trying to fill our new beds."

33.     Rodriguez's reference to "our new beds" referred to the expansion in bed capacity that was underway at ESPC, and which had proven costly because the beds were not filled, and therefore there was a sense of urgency at ESPC to fill beds, which Lieberman hoped would not amount to admitting new patients at any cost.

34.     Therefore, Lieberman challenged Rodriguez's assumptions and priorities, directing Rodriguez to follow the correct PRI and Screen protocols.

35.     When Rodriguez still did not follow the correct protocols, especially with referrals that came directly from the community as opposed to hospitals, Lieberman escalated her concerns to her supervisor, Poskanzer, but no changes were approved by ESPC, as Poskanzer further ignored the more time-consuming aspects of the PRI/PASRR protocols, again telling Lieberman to not worry about them.

36.     Additionally, Lieberman also made her regulatory concerns known to John Tsantakis ("Tsantakis"), the VP of Audit, Project & Risk Management at ESPC, while he was conducting an interview with Lieberman in conjunction with his review of the admissions process for an audit report he was preparing to present to the ESPC Board of Directors, and rather than

8

support Lieberman or assist Lieberman with her concerns, Tsantakis instead questioned why Lieberman was at all involved with the admissions process at ESPC, which in turn made Lieberman concerned that her regulatory concerns would not be addressed by ESPC.

37.     Further, on numerous occasions Lieberman directly discussed her regulatory concerns with Nancy Bollock, Chief Compliance Officer of ESPC, specifically warning Bollock that ESPC was not gathering the PRI and Screen, but Bollock did not assist Lieberman with her concerns.

38.     Also telling, in or about August 2017, Lieberman learned that ESPC, and specifically Heather Stevenson of the ESPC Finance Department, was unlawfully using a "Pediatric PRI" ("PPRI") form to submit a claim for payment to Medicaid.

39.     Lieberman had never heard of a PPRI being used by a nursing home in this fashion and believed it to be an additional unlawful practice that circumvented laws directly and negatively impacting Medicaid, as it made the admissions process unlawfully easy for prospective patients to be admitted, potentially incorrectly, to ESPC.

40.     Upon further researching the applicable rules and regulations, Lieberman found that the PPRI form that ESPC had been using – i.e., DSS-4362 Pediatric Patient Review Instrument ("PPRI-NY") – was replaced in 2013 with a new form called the Uniform Assessment System ("UAS-NY"), which was to be used in conjunction with community-based waiver programs only – i.e., not for admission to Medicaid-certified Nursing Facilities, such as ESPC, so that ESPC was

violating the laws.

41.     In fact, page five of the UAS-NY Transition Guide clearly states, "It is important to note that the UAS-NY is not a nursing home admission tool.  Nursing home admissions will still require a PRI, and staff conducting the PRI must be certified to use that instrument."

42.     In or about August 2017, Lieberman brought these findings to Stevenson's attention who, despite being responsible for ESPC's Medicaid billing procedures, was remarkably dismissive of Lieberman's concerns.

43.     Specifically, Stevenson admitted to Lieberman that she used the PPRI-NY form for billing purposes to demonstrate to Medicaid that the pediatric patient in question met a level of care appropriate for admission to a nursing home, even though the PPRI-NY form was not an admissions form for nursing homes like ESPC and should not have been used in this context.

44.     When Lieberman informed Stevenson that the PPRI-NY form was expressly inapplicable for nursing home Medicaid reimbursement, Stevenson replied in sum and substance that "Medicaid doesn't seem to have a problem with the form so you shouldn't either."

45.     When Lieberman subsequently raised further serious concerns about the legality of this approach, she was rebuked by Stevenson.

46.     When Lieberman later attempted to bring these concerns up the chain of command, ESPC terminated her employment.

47.     Specifically, on September 26, 2017, Lieberman had a conversation with Carolyn Ryan, ESPC VP of Quality, about the fact that she had just learned that a nurse had provided Stevenson with a PPRI-NY to file a claim for payment with Medicaid.

48.     That same day, Lieberman emailed the PRI/Screen FAQs on the New York State Department of Health website to Jane Reinish, Interim Director of Admissions, which explain why ESPC's practices are unlawful and how to properly admit a patient to a Medicaid-certified Nursing Facility.

49.     Approximately three hours later, Lieberman was abruptly terminated and given only two vague explanations that ESPC chose to terminate her position because of budget constraints and that Lieberman's position was a "new position" that ESPC "decided to try out" and that it "did not work out."

50.     The strikingly close temporal proximity between Lieberman's last complaint to ESPC about its fraudulent Medicaid billing practices and her termination a few hours later demonstrates that the real reason ESPC terminated Lieberman was to punish her for complaining about the fraudulent Medicaid billing practices and to chill any other employee working for ESPC from coming forward about its fraudulent billing practices in the future.

11

## AS FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF LIEBERMAN AGAINST DEFENDANTS
## FOR RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h)

51.     Lieberman repeats and realleges paragraphs 1 through 50 hereinabove as if fully stated hereinbelow.

52.     At all material times herein, Lieberman was an employee of ESPC within the meaning of the FCA and as such she was covered by the whistleblower protections set forth in 31 U.S.C. § 3730(h).

53.     Lieberman performed all the terms and conditions of her employment in a satisfactory or exemplary manner.

54.     Lieberman harbored a reasonable suspicion in good faith that ESPC was engaged in unlawful activity that defrauded the federal government.

55.     By the conduct of Defendants, respectively – and the actions or omissions of their agents, employees or officers as described hereinabove – Elizabeth Seton Pediatrics Center and Sisters of Charity each wrongfully retaliated against Lieberman for investigating and reporting the fraudulent practices that allowed Defendants to obtain government funds, including from the United States of America and the State and City of New York, contrary to the whistleblower protections of the FCA, 31 U.S.C. § 3730(h).

56.     Specifically, ESPC violated the FCA, 31 U.S.C. § 3730(h), when they threatened, harassed, discharged, and otherwise discriminated against Lieberman regarding the terms, benefits, conditions, and privileges of her employment because she initiated, investigated, provided testimony for, or otherwise engaged in protected activity that assisted in exposing Defendants' fraud against the federal government.

57.     At all material times material herein, ESPC was aware of Lieberman's actions.

58.     As a direct and proximate result of Defendants' unlawful and wrongful actions or omissions against Lieberman, as described in this complaint, Lieberman has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

## AS FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF LIEBERMAN AGAINST DEFENDANTS
## FOR RETALIATION IN VIOLATION OF NEW YORK STATE FIN. LAW § 191(1)

59.     Lieberman repeats and realleges paragraphs 1 through 50 hereinabove as if fully stated hereinbelow.

60.     At all material times herein, Lieberman was an employee of ESPC within the meaning of the NYFCA and as such she was covered by the whistleblower protections set forth in N.Y. Fin. Law § 191(1).

61.     Lieberman performed all the terms and conditions of her employment in a satisfactory or exemplary manner.

62.     Lieberman harbored a reasonable suspicion in good faith that ESPC was engaged in unlawful activity that defrauded the governmental entities cited herein.

63.     By the conduct of Defendants, respectively – and the actions or omissions of their agents, employees or officers as described hereinabove – Elizabeth Seton Pediatric Center and Sisters of Charity each wrongfully retaliated against Lieberman for investigating and reporting the fraudulent practices that allowed Defendants to obtain government funds, including from the United States of America and the City and State of New York, contrary to the whistleblower protections of N.Y. Fin. Law § 191(1).

64.     Specifically, ESPC violated the NYFCA, N.Y. Fin. Law § 191(1), when they threatened, harassed, discharged, and otherwise discriminated against Plaintiff regarding the terms, benefits, conditions, and privileges of her employment because she initiated, investigated, provided testimony for, or otherwise engaged in protected activity that assisted in exposing Defendants' fraud against the governmental entities cited herein.

65.     At all material times, ESPC was aware of Lieberman's actions.

66.     As a direct and proximate result of ESPC's unlawful and wrongful actions or omissions against Lieberman, as described in this complaint, Lieberman has sustained injuries and

damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

**WHEREFORE,** Plaintiff Rhonda Lieberman demands judgment against Defendants Elizabeth Seton Pediatric Center and Sisters of Charity Foundation, Inc. on the First Cause of Action, for compensatory, punitive and special damages in an amount to be determined at a trial of the matter, as provided by 31 U.S.C. § 3730(h)(2); and on the Second Cause of Action, for compensatory, punitive and special damages in an amount to be determined at a trial of the matter, as provided by N.Y. Fin. Law § 191(1); plus pre-judgment interest, the costs of this action and reasonable attorney's fees; and for such relief as this Court deems just and proper.

Dated: New York, New York
          February 27, 2018

                                            SCHWARTZ PERRY & HELLER, LLP
                                            *Attorneys for Plaintiff*

                                            By:_____
                                               DAVIDA S. PERRY
                                               DANIEL H. KOVEL
                                               3 Park Avenue, 27th Fl.
                                               New York, New York 10016
                                               (212) 889-6565

15